**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| STEPHANIE GROGAN-FULLER, |
| Plaintiff, |
| v. |
| UNITED STATES OF AMERICA and REPAINTEX COMPANY, et al. |
| Defendants. |

Case No.: 1:17-cv-01933-EGS

## MEMORANDUM OPINION

Stephanie Grogan-Fuller brings this action against the United States and two federal contractors, Repaintex Company ("Repaintex") and Trademasters Service, Inc. ("Trademasters"). Ms. Grogan-Fuller alleges that she was injured when she slipped and fell on water that had accumulated on the floor of a building owned, operated, and maintained by the federal government. Invoking the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, her complaint includes claims for negligence and vicarious liability against the government.

Pending before the Court is the government's motion to dismiss the negligence and vicarious liability claims for lack of subject matter jurisdiction. Upon consideration of the motion, the opposition and the reply thereto, the applicable

law, the entire record, and for the reasons stated below, the Court **DENIES** the government's motion to dismiss.

**I. Background**

    **A. Factual Background**

In December of 2015, Ms. Grogan-Fuller was walking down a hallway of the west wing of the Orville Wright Building ("Wright Building") in Washington D.C. when she slipped on water that had accumulated on the floor as a result of a water leak. Amended Compl., ECF No. 20 ¶ 9. She fell to her knees and sustained serious injuries. *Id.* ¶¶ 9-12. At the time she sustained her injuries, Repaintex, a government contractor, provided facility maintenance and janitorial services for the Wright Building. *Id.* ¶ 5. Trademasters, also a government contractor, provided operations and maintenance services for the Wright Building. *Id.* ¶ 6.

Ms. Grogan-Fuller brought suit against the government and the two contractors based on the injuries she sustained as a result of the fall. *See generally id.* She sues the government under the FTCA, alleging that the government was negligent in failing to inspect the hallways to ensure that dangerous conditions did not exist, and vicariously liable for the negligence of the two contractors. *See id.* ¶¶ 13-18, 31-34.

The government has moved to dismiss this case for lack of subject matter jurisdiction. In support of its motion to

dismiss, the government attaches the declarations of Calvert Jones, United States General Services Administration ("GSA") Building Manager for the Wright Building, and Elaina Walker, GSA's Supervisory Contract Specialist. *See* Decl. of Calvert Jones ("Jones Decl."), ECF No. 15-2; Decl. of Elaina Walker ("Walker Repaintex Decl."), ECF No. 15-3; Decl. of Elaina Walker (Walker Trademasters Decl."), ECF No. 15-4. The government also attaches the respective contracts between the government and the contractors. *See* Walker Repaintex Decl., Ex. B., ECF No. 15-5; Walker Trademasters Decl., Ex. C., ECF No. 15-6. The declarations and contracts detail the obligations and responsibilities of the government with respect to the contractors.[1]

**B. Contractual Provisions**

**1. Repaintex Contract**

In her role as Contract Specialist, Ms. Walker explains that she is responsible "for the creation and implementation of contracts dealing with custodial services" and that at the time Ms. Grogan-Fuller's accident occurred, she was in charge of the "implementation of the custodial services contract that was in effect at the [Wright Building]." Walker Repaintex Decl., ECF

---

[1] The Court may review such materials to determine its jurisdiction without turning the motion to dismiss into one for summary judgment. *See Caesar v. United States*, 258 F. Supp. 2d 1, 2 (D.D.C. 2003).

No. 15-3 ¶¶ 2-3. Ms. Walker attached to her declaration the contract awarded to Repaintex for custodial services. *Id.* Ex. B., ECF No. 15-5.

Section C of the contract, entitled "Description/ Specification/ Statement of Work" sets forth the general parameters of the work to be performed by Repaintex. *Id.* at 18.[2] Several provisions in Section C relate to the maintenance of floors. Repaintex was required to "[f]urnish all personnel, labor, equipment, materials, tools, supplies, supervision, management . . . and services, except as may be expressly set forth as Government furnished." *Id.* at 21. Section C also states that Repaintex shall "[b]e responsible to make the management and operational decisions to meet the quality performance standards required under this contract." *Id.*

With respect to the accumulation of water on the floor, Section C states that "[t]he performance of the cleaning at building(s) shall take place between the hours of 6:00 a.m. and 9:00 p.m." and that on a daily basis "[Repaintex] will furnish the [Contract Officer's Representative Designee] 64 man-hours per day to perform support services . . . includ[ing] but not limited to" responding to "[s]ervice complaints," "cleanup work

---

[2] When citing electronic filings throughout this Memorandum Opinion, the Court cites to the ECF header page number, not the original page number of the filed document.

4

made necessary by toilet floods and similar occurrences" and "[p]rovid[ing] additional cleaning and servicing requirement[s] as identified by the [Contracting Officer's Representative Designee.]" *Id.* at 22. The contract further states that "**[t]he person(s) performing the support service duties will take instruction only from the GSA Buildings Manager or his designee during the 64 hours assigned to GSA**." *Id.* (emphasis in original). Section C also provides that "[Repaintex] shall make reasonable efforts to assist the Government to prevent hazardous conditions and property damage." *Id.* at 34.

Section C contains a carve out for service calls made by the government to the contractor's workers. Section C defines service calls as "standard service requirements, such as nonrecurring requests for rearranging furniture in a conference room, special events support, spills, replenishing restroom supplies, etc." *Id.* at 20. Service calls which the Contracting Officer or her designee "determines to be urgent (spilled water in traffic areas . . . etc.) shall be handled immediately." *Id.* at 34.

Ms. Jones, the Building Manager for the Wright Building at the time of the accident, filed a declaration containing certain statements related to the Repaintex contract. *See generally* Jones Decl., ECF No. 15-2. Ms. Jones stated that Repaintex "routinely cleaned the floors throughout the building in order

5

to fulfill its contracting duties." *Id.* ¶ 4. She stated that GSA "in no way controlled how Repaintex implemented its custodial practices on a daily or any other routine basis." *Id.* ¶ 8.

### 2. Trademasters Contract

Ms. Walker also attached a declaration explaining the operations and maintenance contract the government entered into with Trademasters. Walker Trademasters Decl., ECF No. 15-4. With respect to that contract, Ms. Walker supervises "the Contract Specialist responsible for the implementation of the operation and maintenance contract ('O&M contract') that was in effect at the [Wright Building]" at the time of Ms. Grogan-Fuller's accident. *Id.* ¶ 3. She also attached the Trademasters contract to her declaration. Walker Trademasters Decl., Ex. C., ECF No. 15-6.

Several provisions in the contract are relevant to potential liability for Ms. Grogan-Fuller's accident. Section C of the Trademasters contract provides that Trademasters is responsible for "plumbing" "[s]ervice request desk operations," and "maintain[ing] kitchen/concession area drains." *Id.* at 27-28. The Section incorporates standards set by the International Plumbing Code. *Id.* at 39. Section C requires Trademasters to prepare a Building Operating Plan that is a compilation of the requirements in the Statement of Work, and lists information such as a "description of how building equipment data is

6

maintained and updated . . . contingency plans for . . . [f]loods including flooding caused by plumbing breaks[, h]azardous materials including . . . leaks or spills [and] water management[.]" *Id.* at 48.

Section C also governs emergency requests to Trademasters related to water issues. Under the contract, "the [g]overnment (or, where applicable, the tenant Agency) may transmit work orders to the Contractor for service request[s] or emergency service request[s]." *Id.* at 279. Emergency service requests are defined as "service requests where the work consists of correcting failures that constitute an immediate danger to personnel or property, included but not limited to: broken water pipes." *Id.* Trademasters was required to respond to these emergency requests during normal working hours within 15 minutes. *Id.* Trademasters was also required to "assist in identifying facility health and safety hazards and report all hazards in writing" to the Contract Officer. *Id.* at 297.

Ms. Jones also stated that "Trademasters was responsible for all operations and maintenance services within the [Wright Building], and that GSA in "no way controlled how Trademasters implemented its operations and maintenance practices on a daily or any other routine basis." Jones Decl., ECF No. 15-2 ¶ 12, 17.

## II. Legal Standard

### A. Standard of Review for a Motion to Dismiss under 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) "presents a threshold challenge to the Court's jurisdiction," and thus "the Court is obligated to determine whether it has subject-matter jurisdiction in the first instance." *Curran v. Holder*, 626 F. Supp. 2d 30, 32 (D.D.C. 2009)(internal citation and quotation marks omitted). "It is to be presumed that a cause lies outside [a federal court's] limited jurisdiction*," Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), unless the plaintiff can establish by a preponderance of the evidence that the Court possesses jurisdiction, *see, e.g.*, *U.S. ex rel. Digital Healthcare*, *Inc. v. Affiliated Computer*, 778 F. Supp. 2d 37, 43 (D.D.C. 2011)(citation omitted). Thus, the "'plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim.'" *Id.* (quoting *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001)(internal citation and quotation marks omitted)).

A motion to dismiss for lack of jurisdiction may be presented as either a facial or factual challenge. "A facial challenge attacks the factual allegations of the complaint that

are contained on the face of the complaint, while a factual challenge is addressed to the underlying facts contained in the complaint." *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 20 (D.D.C. 2003)(internal quotations and citations omitted). When a defendant makes a facial challenge, the district court must accept the allegations contained in the complaint as true and consider the factual allegations in the light most favorable to the non-moving party. *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006). With respect to a factual challenge, the district court may consider materials outside of the pleadings to determine whether it has subject matter jurisdiction over the claims. *Jerome Stevens Pharmacy, Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

**B. FTCA**

Sovereign immunity shields the federal government and its agencies from suit and is "jurisdictional in nature." *Am. Road & Transp. Builders Ass'n v. EPA*, 865 F. Supp. 2d 72, 79 (D.D.C. 2012)(quoting *FDIC v. Meyer*, 510 U.S. 471, 475, (1994))(other citations omitted). The government may waive immunity, but such a waiver "must be unequivocally expressed in statutory text, and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996)(internal citations omitted). The FTCA contains a limited waiver of sovereign immunity that allows the United States to be sued for the negligent acts or omissions of its employees acting

9

within the scope of their employment. *See* 28 U.S.C. § 1346(b)(1); *see also United States v. Orleans*, 425 U.S. 807, 813 (1976).

**III. Analysis**

The government argues that sovereign immunity bars Ms. Grogan-Fuller's claims for vicarious liability and negligence brought against the United States. The Court addresses each claim in turn.

**A. Vicarious Liability: Independent Contractor Exception**

Ms. Grogan-Fuller brings a claim for vicarious liability based on the alleged negligent actions of Repaintex and Trademasters. Amend Compl., ECF No. 20 ¶ 34. As discussed above, the FTCA contains a limited waiver of sovereign immunity for the negligent acts or omissions of its employees. *See* 28 U.S.C. § 1346(b)(1). The FTCA's definition of "employee of the government" includes "employees of any federal agency," but the definition of "federal agency" explicitly excludes "any contractor with the United States." 28 U.S.C. § 2671. Based on this language, the Supreme Court has recognized an "independent contractor exception" to the FTCA. *See Orleans*, 425 U.S. at 814–15.

When considering whether the independent contractor exception to the FTCA applies, a court must evaluate the level of control that the United States exercises over the contractor.

*Id.* Under this exception, the government is only liable for a contractor's acts, if the contractor's "day-to-day operations are supervised by the Federal Government." *Id.* at 815. A "critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.'" *Id.* at 814 (quoting *Logue v. United States*, 412 U.S. 521, 528 (1973)). The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has made clear that "the government may 'fix specific and precise conditions to implement federal objectives' without becoming liable for an independent contractor's negligence." *Macharia v. United States*, 334 F.3d 61, 68–69 (D.C. Cir. 2003) (quoting *Orleans*, 425 U.S. at 816). The government is also permitted to "reserve the right to inspect the contractor's work and monitor its compliance with federal law without vitiating the independent contractor exception." *Hsieh v. Consol. Eng'g Servs., Inc.*, 569 F. Supp. 2d 159, 177 (D.D.C. 2008)(citing *Orleans*, 425 U.S. at 815).

Whether the government is involved with a contractor's day-to-day activities such that the independent contractor exception applies is a "peculiarly fact-specific inquiry," which does not normally "lend itself easily to dismissal before discovery." *Phillips v. Federal Bureau of Prisons*, 271 F. Supp. 2d 97 (D.D.C. 2003). Courts in this District, however, are amendable

11

to dismissing these types of cases when the documentation in support of the government's motion to dismiss is "clear and uncontroverted" on the issue of whether the independent contractor exception applies. *Id.* For example, in *Phillips* the plaintiff sued the government for negligence when the staff of a halfway house failed to act after the plaintiff's son informed the staff that he had received a threat on his life. *Id.* at 99. The halfway house was a private facility that contracted with a government agency to provide services to inmates in the District of Columbia. *Id.* The plaintiff's son was fatally wounded by an unknown assailant on the same day he warned the staff about the threat. *Id.* In the government's motion to dismiss, it provided the contract governing the agreement between the halfway house and the government, which stated in relevant part that it was the contractor's obligation to provide for the safekeeping of persons residing in the facility. *Id.* at 101. Additionally, a government employee attested that the government was not involved in the daily operations of the facility. *Id.* The plaintiff failed to controvert any facts in the declaration. *Id.*

The district court in *Phillips* noted that although the degree to which the government controls a contractor is typically a fact intensive inquiry, the documentation in support of the government's motion made it clear that the government did not play any role in the staffing of the facility or the

safekeeping of its residents. *Id.* Critically, the plaintiff did not challenge the agency's contention that the agency was not involved in the day-to-day operations of the facility. *Id.* Because the court found that the supporting documents were clear and uncontroverted, it granted the motion to dismiss on the FTCA claim. *Id.*

Here, the documents supporting the government's position are not clear and are far from uncontroverted. As to Repaintex, the contract at issue states that on a daily basis "[Repaintex] will furnish the [Contract Officer's Representative Designee] 64 man-hours per day to perform support services . . . includ[ing] but not limited to" responding to "[s]ervice complaints," "cleanup work made necessary by toilet floods and similar occurrences" and "[p]rovid[ing] additional cleaning and servicing requirement[s] as identified by the [Contracting Officer's Representative Designee.]" Walker Repaintex Decl., Ex. B., ECF No. 15-5 at 22. Critically, the people performing the support service duties (i.e., responding to service complaints and cleanup work made necessary by flooding) "**will take instruction only from the GSA Buildings Manager or his designee**" while they are completing their duties. *Id.* (emphasis in original). Additionally, the government had the ability to classify certain service calls as urgent including "spilled water in traffic areas" which required the contractor to act

13

immediately if a call was so designated. *Id.* at 34. Last, Repaintex was required to make reasonable efforts to "assist the Government to prevent hazardous conditions and property damage." *Id.* at 34. Ms. Grogan-Fuller references these provisions and challenges the government's contention that it did not control the day-to-day operations of Repaintex. *See* Pl.'s Opp'n., ECF No. 16 at 10–13. Under these provisions of the contract, there is some indication that, at least when it came to "spilled water in traffic areas", the government controlled the daily activities of Repaintex.

As for Trademasters, there are provisions in its contract that lead to the same indication. For instance, the "[g]overnment (or, where applicable, the tenant Agency) may transmit work orders to the Contractor for service request[s] or emergency service request[s]." Walker Trademasters Decl., Ex. C., ECF No. 15-6 at 279. Emergency service requests included "broken water pipes." *Id.* Trademasters was required to respond to these emergency requests during normal working hours within 15 minutes. *Id.* These provisions are unlike provisions in other cases which merely give the government the right to conduct oversight and inspection. *See Verizon Washington, D.C., Inc. v. United States*, 254 F. Supp. 3d 208 (2017)(applying independent contractor exception, and dismissing case, when government was simply inspecting contractor's work). Here, in contrast, the

contractual language suggests that the government took an active role in directing when and how the contractors responded to "broken water pipes" and "spilled water in traffic areas." And for good reason as such occurrences can lead to dangerous conditions. Under these provisions it is not clear, at this stage in the proceedings, that the government did not "control the detailed physical performance of the contractor*." See Orleans*, 425 U.S. at 815.

The Court also notes that in the only case on which the government relies, *Hsieh v. Consolidated Engineering Services*, the court had the benefit of discovery in determining the relationship between the government and the contractors. *See, e.g.*, 569 F. Supp. 2d at 178 (analyzing deposition testimony). In this case there has been no discovery or deposition testimony, and thus the Court is limited to declarations and unclear contractual provisions which bear on the question of who is responsible for the conditions of the Wright Building. "Although courts must, at times, resolve factual disputes raised in threshold jurisdictional motions," a court should defer its jurisdictional decision when the disputed jurisdictional facts are "indistinguishable from the central question on the merits of who was at fault." *Hale v. United States*, 2015 WL 7760161 at *6 (D.D.C. 2015); *see also Herbert v. Nat'l Acad. of Sciences.*, 974 F.2d 192, 198 (D.C. Cir. 1992)("[T]hough the trial court may

rule on disputed jurisdictional facts at any time, if they are inextricably intertwined with the merits of the case it should usually defer its jurisdictional decision until the merits are heard."). The government is free to argue in subsequent proceedings that addressing spills was solely the contractors' responsibility, and that it had no control over the contractors. Such arguments, however, rely on the resolution of contested factual issues and require that parties "first be afforded a more complete opportunity to discover and to dispute the relevant facts." *Hale*, 2015 WL 7760161 at *6. Accordingly, the government's motion to dismiss the vicarious liability count is **DENIED**.

   **B. Negligence Claims Against Government**

   In addition to her claim for vicarious liability, Ms. Grogan-Fuller alleges that the government itself was negligent because it had a duty to inspect the hallway where she fell to ensure dangerous conditions did not exist, and alleges that the government either knew or should have known such conditions existed. Amend. Compl., ECF No. 20 ¶ 15. Under District of Columbia Law, a landowner has a duty to use reasonable care for the safety of all persons lawfully present on the landowner's property. *Smith v. Arbaugh's Rest., Inc.*, 469 F.2d 97, 100 (D.C.

Cir. 1972).[3] A plaintiff seeking to recover for a breach of this duty must show "that the defendant had notice—either actual or constructive—of the present existence of an allegedly dangerous condition." *Smith v. Washington Sheraton Corp.*, 135 F.3d 779, 782 (D.C. Cir. 1998)(internal quotation marks and citation omitted).

The government seemingly acknowledges that Ms. Grogan-Fuller has alleged a claim of negligence independent from the actions of the contractors. Def.'s Reply, ECF No. 18 at 1 (stating Ms. Grogan-Fuller has argued that the government has failed to address her claims of its own negligence). However, the government does not address Ms. Grogan-Fuller's assertion that the government employees, themselves, were negligent. *See generally id*. (limiting arguments to the application of the independent contractor exception). Instead, the government simply reiterates the point that the contractors are responsible for her injuries and, again, argues the independent contractor exception to the FTCA applies in this case. *Id.*

---

[3] The substantive law that governs in an FTCA action is that of the state where the act or omission occurred. 28 U.S.C. § 1346(b)(1); *see also Richards v. United States*, 369 U.S. 1, 9 (1962)("Where the negligence and the injury normally occur simultaneously and in a single jurisdiction, the law to be applied is clear, and no solution to the meaning of the words 'the law of the place where the act or omission occurred' is required."). Ms. Grogan-Fuller's accident occurred in the District of Columbia and therefore D.C. provides the substantive law for her FTCA claim.

This argument misses the point. While the FTCA does not authorize the United States to assume the liability for the acts of its independent contractors, it does waive the United States' immunity from suit resulting from the acts of its employees and agencies working on behalf of the United States. *See* 28 U.S.C. §§ 1346(b), 2671; *see also Logue* 412 U.S. at 532-33. The fact that the government may be able to show that Ms. Grogan-Fuller's injuries resulted from the negligence of its contractors, independent or not, does not preclude claims against the government for its own negligence with regard to the injury. For example in *Logue*, the Supreme Court held that government could not be held liable for the actions of its contractors at a federal prison, when a federal prisoner committed suicide while being held at a county jail, because they were not employees of the United States. 412 U.S. at 525–26, 530. However, the Court left open the possibility of a FTCA claim based on the related failure, if any, of a federal deputy marshal, who was an employee of the United States, to make "specific arrangements . . . for constant surveillance of the prisoner," while he was in the custody of the employees of the county jail. *Id.* at 532–33 (internal quotation marks and citation omitted).

In this case, Ms. Grogan-Fuller alleges that the government, as the owner of the Wright Building, had actual or constructive notice of the allegedly hazardous condition in the

Wright Building, *see* Amended Compl. ECF No. 20 ¶ 15, and that it was the negligence of its federal employees, in addition to actions of the contractors, in failing to warn or failing to remedy the conditions that led to her injuries, *id.* ¶ 16. Taking these allegations as true, the government is potentially subject to suit under the FTCA for the negligent actions of its employees. The government failed to respond to this argument, and therefore its motion to dismiss the negligence count of the complaint is **DENIED**. *Franklin v. Potter*, 600 F. Supp. 2d 38, 60 (D.D.C. 2009)(treating defendant's argument in summary judgment motion as conceded where plaintiff failed to address it in plaintiff's response).

**IV. Conclusion**

For the foregoing reasons the government's motion to dismiss is **DENIED**. An appropriate order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**March 25, 2019**